IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

ROBERT E. FITZ            )
                          )
v.                        )        No. 1:06-0003
                          )        Judge Wiseman/Bryant
MICHAEL J. ASTRUE, Commissioner of )
Social Security,[1] and HARTFORD   )
LIFE AND ACCIDENT INSURANCE CO.    )

## REPORT AND RECOMMENDATION

### I.   INTRODUCTION

Plaintiff Robert E. Fitz filed this action pro se,
seeking judicial review of the denial of disability benefits by
both the Commissioner of Social Security and his former
employer's group long-term disability insurer, as authorized by
42 U.S.C. § 405(g) and 29 U.S.C. § 1132(a)(1)(B), respectively.
(Docket Entry No. 1)  Separate briefing schedules were entered
for the Social Security and ERISA issues raised in this action.
(Docket Entry Nos. 13, 15)  In accordance with the Court's
briefing orders, plaintiff filed, under seal, what has been
construed as a motion for judgment on the administrative record
(Docket Entry No. 14), to which the government has responded
(Docket Entry No. 16); and, Hartford Life and Accident Insurance
Company (hereinafter, "Hartford") filed a transcript of the

---

[1]Michael J. Astrue replaced Jo Anne B. Barnhart as the Commissioner of
Social Security on February 12, 2007, and is "automatically substituted" as
party defendant in this case, pursuant to Fed.R.Civ.P. 25(d)(1).

1

administrative record and a motion for judgment on that record (Docket Entry No. 21), to which plaintiff has not responded. Hartford further filed a motion to strike evidence outside of the administrative record (Docket Entry No. 18), which the undersigned has granted by separate order.

For the reasons given below, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be DENIED; that the decision of the Commissioner of Social Security be AFFIRMED; that Hartford's motion for judgment on the administrative record be GRANTED; and, that plaintiff's case be DISMISSED with prejudice.

## II. DISCUSSION

### A. Review of the Decision of the Commissioner of Social Security

#### 1. Procedural History

Plaintiff filed an application for disability insurance benefits on June 25, 2001, alleging disability since September 8, 2000 due to major depression and bipolar disorder (Tr. 19, 112). The application was denied initially and upon reconsideration (Tr. 19). Plaintiff thereafter requested and received a hearing before an Administrative Law Judge (ALJ), who heard testimony from plaintiff and a vocational expert (VE) on August 13, 2004 (Tr. 29-66). Plaintiff was represented by counsel at the hearing.

2

On December 15, 2004, the ALJ issued a written decision denying plaintiff's claim (Tr. 19-24). At the conclusion of his decision, the ALJ made the following findings:

1. The claimant met the insured status requirements of title II of the Social Security Act on September 8, 2000, the alleged onset date of disability, and continues to meet them through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since September 8, 2000.

3. The evidence establishes that the claimant has a severe impairment, a bipolar disorder with a depressed mood, but that he does not have any impairment or combination of impairments of the level of severity required by 20 CFR Part 404, Subpart P, Appendix 1.

4. The evidence establishes that the claimant has not experienced any depression or other symptomatology of a disabling level of severity on an ongoing basis.

5. The claimant retains the residual functional capacity to perform work at all exertional levels which is unskilled in nature with a moderate reduction in his ability to maintain concentration and attention, a moderate limitation in his ability to carry out simple and detailed job instructions, and a moderate limitation in his ability to cope with work pressure.

6. The claimant cannot perform his vocationally relevant past work.

7. The claimant was 55 years old in September 2000, a person of advanced age, and is currently 60 years old, a person closely approaching retirement age.

8. The claimant has a college education.

9. The claimant performed skilled work within his vocationally relevant past, but cannot transfer his job skills to work which is within his current residual functional capacity.

10. If the claimant's nonexertional limitations did not

3

significantly compromise his ability to perform work at
all exertional levels, section 204.00, Appendix 2,
Subpart P, Regulations No. 4 indicates that a finding
of not disabled would be appropriate.

11.  Considering the types of work which the claimant is
still functionally capable of performing in combination
with his age, education, and work experience, he can be
expected to make a vocational adjustment to work which
exists in significant numbers in the national economy.
Examples of such jobs are cashier, assembler, machine
operator, packer, woodworking machine operator,
cleaner, and service station attendant.  The vocational
expert indicated that there are about 48,500 of the
named sample jobs in existence in Tennessee, with over
1,500,000 of such jobs in existence in the national
economy; a significant number of jobs.

12.  The claimant was not under a "disability," as defined
in the Social Security Act, at any time through the
date of this decision.  20 CFR 404.1520(g).

(Tr. 22-23)

On November 9, 2005, the Appeals Council denied

plaintiff's request for review of the decision of the ALJ (Tr. 4-

6), thereby rendering that decision the final decision of the

Commissioner.  This civil action was thereafter timely filed, and

the Court has jurisdiction.  42 U.S.C. § 405(g).  If the

Commissioner's findings are supported by substantial evidence,

based on the record as a whole, then these findings are

conclusive.  Id.


2.  Review of the Record

a.  Medical Evidence

After ending his employment in 2000 following an award

4

of benefits by his employer's disability carrier (Tr. 83), plaintiff began treatment in January 2001 with Dr. Deborah Watts, M.D., a psychiatrist (Tr. 175-76).  Dr. Watts noted plaintiff's report of medical treatment for his depression since 1999, when he was first put on antidepressive medication by his family physician, Dr. Piersma (Tr. 175).  He was seeing a counselor prior to his initial visit to Dr. Watts, but discontinued counseling due to his insurance.  (Id.)  Plaintiff complained to Dr. Watts about crying spells, low energy, poor concentration, insomnia, anhedonia,[2] poor appetite, and feelings of hopelessness and worthlessness.  (Id.)  Dr. Watts diagnosed bipolar disorder, current episode depressed, and assigned a score of 65 on the Global Assessment of Functioning (GAF) scale, indicating mild symptoms or some functional limitations, but that plaintiff was generally functioning pretty well.[3]  Dr. Watts prescribed individual therapy and treatment with Lithium to control manic symptoms, on top of the antidepressant Prozac which plaintiff's family physician had prescribed (Tr. 174).  Dr. Watts subsequently discontinued treatment with Lithium, tapered and eventually discontinued treatment with Prozac, and prescribed first Depakote for control of manic symptoms, and then the

---

[2]Anhedonia is defined as the "total loss of feeling of pleasure in acts that normally give pleasure."  Dorland's Illustrated Medical Dictionary 83 (28th ed. 1994).

[3]See Diagnostic and Statistical Manual of Mental Disorders IV-TR 34 (4th ed. 2000).

5

antidepressant Wellbutrin (Tr. 165-173). After April 2001, there are no treatment records until January 2002, when Dr. Watts increased plaintiff's dosage of Lamictal, a drug used to prolong periods of mood stabilization in bipolar patients (Tr. 146). Dr. Watts last saw plaintiff on March 29, 2002 (Tr. 143).

On May 8, 2002, plaintiff presented for an initial psychiatric evaluation by psychiatrist Raju Indukuri, M.D. (Tr. 138-40). Dr. Indukuri noted that plaintiff displayed fair insight and judgment, but poor immediate memory and concentration (Tr. 139). He diagnosed an unspecified mood disorder and major depression, with rule out diagnoses of bipolar disorder and severe, recurrent major depression, and assigned a GAF of 65. (Id.) Dr. Indukuri prescribed the antidepressant Celexa. (Id.) Two weeks later, he added the antidepressant Effexor (Tr. 137). Over the next year, Dr. Indukuri treated plaintiff with different mood drugs, diagnosing him with bipolar disorder and, beginning in February 2003, attention deficit-hyperactivity disorder (ADHD), for which the drugs Adderall and Strattera were prescribed (Tr. 129-37). During this time, plaintiff continued to report symptoms including depression, lack of energy, poor concentration, poor attention span, decreased motivation, and feelings of hopelessness (id.), as well as feelings of worthlessness and passive suicidal thoughts on one occasion (Tr. 136).

6

On October 16, 2002, Dr. Indukuri completed questionnaires at plaintiff's counsel's behest, indicating that plaintiff has a depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activites; sleep disturbance; psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; and, difficulty concentrating or thinking (Tr. 125). Dr. Indukuri further indicated that plaintiff had moderate restriction of activities of daily living, marked difficulties in maintaining social functioning, and frequent deficiencies of concentration, persistence or pace, with three episodes of deterioration or decompensation which caused plaintiff to withdraw or to experience an exacerbation of symptoms (Tr. 126). Finally, Dr. Indukuri indicated that plaintiff was able to understand and carry out simple instructions, but was unable to remember simple instructions, and was further unable to respond appropriately to usual work situations on a sustained basis or to deal with changes in a routine work setting on a sustained basis (Tr. 127).

At monthly visits from May to September 2003, plaintiff continued to complain to Dr. Indukuri of fatigue, decreased energy, inability to complete tasks, depression, and lack of motivation, and made isolated complaints of urinary retention and worrying that he may have been exposed to carbon monoxide poisoning (Tr. 152-54). During this time, Dr. Indukuri continued

7

to diagnose mood disorder and ADHD, and continued to prescribe Celexa, Adderall, Strattera, as well as the sleep aid Ambien and a drug to promote daytime wakefulness, Provigil.[4] (Id.) On October 22, 2003, plaintiff reported that he had a good trip to California, and admitted being in a fair mood with good energy (Tr. 151). However, on December 10, 2003, plaintiff again complained of depression, hopelessness, and decreased energy, prompting Dr. Indukuri to discontinue treatment with Celexa and start another antidepressant, Zoloft. (Id.) In January and February 2004, plaintiff complained of memory problems including short term memory loss, being inattentive and very distracted, with a frustrated mood and an inability to complete tasks (Tr. 149). Dr. Indukuri continued the existing medical treatment under the same diagnoses, but added the drug Exelon, which is often used in the treatment of Alzheimer's patients to improve mental function.[5] (Id.)

On March 17, 2004, Dr. Indukuri again filled out disability forms provided by counsel (Tr. 147-48), indicating the same depressive symptoms as he had in 2002, with the same level of functional restriction, although by 2004 plaintiff was determined to have had "four or more (repeated)" extended episodes of decompensation, compared to the three he had suffered

---

[4]http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a602016.html

[5]http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a602009.html

when Dr. Indukuri filled out the same form in 2002.  Dr. Indukuri
also completed a form assessment documenting plaintiff's
proclivity to decompensation upon even a slight change in his
environment or the mental demands placed upon him, as well as his
inability to function outside of a highly supportive living
arrangement (Tr. 150).  Finally, Dr. Indukuri indicated that
plaintiff remained unable to remember simple instructions or to
deal with changes in a routine work setting on a sustained basis,
though by 2004 plaintiff was assessed as capable of responding
appropriately on a sustained basis to usual work situations.[6]

On May 26, 2004, plaintiff was examined by a licensed
psychologist, Dr. Deborah Doineau, Ed.D., at government expense
(Tr. 155-163).  The report of this consultative examination
indicates that Dr. Doineau was provided with Dr. Indukuri's
medical records by the government prior to examining plaintiff
(Tr. 156).  At the time of the examination, plaintiff was
attempting to establish his own business, involving the sale of
long distance service and cell phones (Tr. 157-58).  Dr. Doineau
noted that plaintiff's speech was clear and coherent, "but
notable for tangentiality at times."  (Tr. 158)  She noted that
his memory seemed intact for details, and that he could recall 3
out of 3 unrelated words immediately, but only 1 out of 3 after

_____

[6]As noted by the ALJ, the forms which Dr. Indukuri was given to fill out
are based on the criteria for medically disabling depression under § 12.04 of
the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, App. 1.

9

five minutes.  (Id.)  Plaintiff's insight, judgment, and psychomotor status were all normal.  (Id.)  Plaintiff complained that his biggest problem was getting things done, and that he was easily distracted from any task except whittling, which he does for hours at a time.  (Tr. 158-59)  Dr. Doineau reported that "[e]xcept for whittling, he has trouble concentrating," and further that whittling small wooden flowers was his main interest and had been for about ten years, and that it "seems to calm him down."  (Tr. 159)  He further complained of fluctuating mood, energy, and motivation.  (Id.)  Plaintiff further complained of difficulties with making decisions, and reported that he was prone to impulsive spending and pursuit of interests which he would soon abandon:  "For example, he will buy the car, with the intention of fixing it up, but loses interest in the activity before it is completed."  (Id.)

Dr. Doineau recorded plaintiff's report of daily activities, including feeding the livestock, organizing his tools, whittling off and on (sometimes up to 12 hours per day), some cleaning and cooking, sometimes going to yard sales on Saturdays with his wife, and driving into town several times per week in order to attempt to sell his cell phone products or to resell items he has purchased from other people for a profit. (Id.)  Dr. Doineau diagnosed "Bipolar 2 disorder, most recent episode mixed, moderate" and assigned a GAF score of 60,

10

indicating moderate symptoms or functional limitations (Tr. 160).

Consistent with these findings, Dr. Doineau rendered the

following medical assessment:

> Mr. Fitz is capable of understanding instructions. He
> appears to have moderate impairment of his ability to
> concentrate. His memory appears to be mildly impaired.
> He is capable of maintaining an adequate level of
> hygiene. He is capable of using public transportation
> without assistance. He is capable of adapting to
> changes in the environment. Persistence and motivation
> appear to be moderately impaired.

(Id.) Finally, Dr. Doineau assessed a moderate limitation in

plaintiff's ability to carry out short, simple instructions, as

well as detailed instructions; moderate limitation in his ability

to understand and remember detailed instructions was also

assessed. (Tr. 162) Plaintiff was also found to have moderate

limitation in his ability to respond appropriately to work

pressures in a usual work setting, and slight limitation in his

ability to respond appropriately to changes in a routine work

setting, since stress exacerbates his condition (Tr. 163). Dr.

Doineau assessed plaintiff as capable of managing any benefits

that might be awarded (Tr. 160, 163).

### b. Testimonial Evidence

The ALJ summarized plaintiff's hearing testimony as

follows:

> The claimant related at his hearing that he obtained a
> college degree in mechanical engineering and has
> performed white-collar jobs such as being a project
> manager and a quality assurance supervisor. He alleged
> that he can no longer perform such jobs because they

11

require quick decisionmaking.  He related that he
experiences depression, making it difficult for him to
get up in the mornings or to concentrate on tasks for
prolonged periods exceeding about 30 minutes.  He sees
a psychiatrist and takes medication for his depression,
and has tried other self-help methods such as reading
books.  He related that his wife leaves him notes to do
certain things, but that he does not get the tasks
done.  He alleged that he forgets what he reads.  He
complained of intermittently experiencing crying spells
and feelings of panic, occurring as often as once a day
to once every few months.  He claimed that he would
prefer to be alone now and avoids people, whereas he
used to be good with people.  He said that he planned
on trying to get a job in Lewisburg, but did not get
his resume in on time.  He related that he engages in
activities such as whittling, feeding and caring for
about 13 head of cattle and their calves, caring for
goats and dogs, attending flea markets.  He said he
works about 10 hours a week on his farm.

(Tr. 21)

        The VE testified that plaintiff's past relevant work

was at the skilled level (Tr. 62).  She further testified that,

assuming the mental capacity to perform skilled work, the

moderate limitations assessed by Dr. Doineau would not preclude

performance of plaintiff's past relevant work (Tr. 62-63).  In

the absence of the mental capacity to perform skilled or

semiskilled work, the VE was able to identify a number of jobs

within the state and nation which would be available to a person

with the limitations described in Dr. Doineau's assessment (Tr.

63-64).  Finally, the VE testified that several of the

limitations assessed by Dr. Indukuri would eliminate the

possibility of employment in the jobs identified (Tr. 65).

12

3. <u>Conclusions of Law</u>

a. <u>Standard of Review</u>

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. <u>Jones v. Sec'y of Health & Human Servs.</u>, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. <u>Landsaw v. Sec'y of Health & Human Servs.</u>, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." <u>Her v. Comm'r of Soc. Sec.</u>, 203 F.3d 388, 389 (6th Cir. 1999)(<u>citing</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." <u>Bell v. Comm'r of Soc. Sec.</u>, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. <u>Her</u>, 203 F.3d at 389 (<u>citing</u> <u>Key v. Callahan</u>, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's

13

conclusion is undermined.  <u>Hurst v. Sec'y of Health & Human Servs.</u>, 753 F.2d 517, 519 (6th Cir. 1985).

 b.  <u>Proceedings at the Administrative Level</u>

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process, as follows:

(1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
(2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
(3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[7] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.
(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a <u>prima facie</u> case of disability.
(5)  Once the claimant establishes a <u>prima facie</u> case of disability, it becomes the Commissioner's burden to

_____

[7]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

14

establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid can not be used to direct a conclusion, but only as a guide to the disability determination. Id. In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's prima facie case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony. See Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §

15

423(d)(2)(B); <u>Foster v. Bowen</u>, 853 F.2d 483, 490 (6th Cir. 1988).

c.  <u>Plaintiff's Statement of Errors</u>

Plaintiff alleges error in the ALJ's rejection of Dr. Indukuri's assessments, and so implicitly alleges satisfaction of the criteria of Listing 12.04.  He further takes issue with a number of the ALJ's statements and inferences, as well as the vocational impact of his mental limitations as found by the ALJ. Alternatively, plaintiff argues that remand under the sixth sentence of 42 U.S.C. § 405(g), for administrative consideration of new and material evidence, is in order so that laboratory results indicating the presence of Lyme disease may be considered.  As explained below, these allegations and arguments are unavailing.

i.  <u>Reversal is not required</u>

As noted by the ALJ, Dr. Indukuri's status as a treating specialist requires that significant deference be accorded his opinions, 20 C.F.R. § 404.1527(d)(2), (5), unless those opinions are undermined by substantial evidence or other good reason exists for their rejection, as specified in the ALJ's decision.  <u>Wilson v. Comm'r of Soc. Sec.</u>, 378 F.3d 541, 544 (6th Cir. 2004).  The ALJ discounted Dr. Indukuri's opinion of disability because it conflicts with his own treatment notes, his prior assignment of a GAF score of 65 (indicating mild symptoms), and plaintiff's activity level (Tr. 20), and instead adopted Dr.

16

Doineau's assessment as more supported by "the overall evidence," pursuant to 20 C.F.R. § 404.1527(d)(6). (Tr. 21)

However, as argued by plaintiff's counsel before the agency (Tr. 193-94) and reiterated by plaintiff here, it does not appear that Dr. Indukuri's assessments are entirely unsupported by his treatment notes. As reflected in the summary of evidence above, Dr. Indukuri repeatedly recorded in his notes plaintiff's complaints of depression, lack of energy, lack of motivation, problems concentrating, problems with short term memory loss, inability to complete tasks, poor attention span, and feelings of hopelessness or worthlessness. While there is no significant clinical evidence other than these observations, psychological impairments are often ill suited to substantiation by laboratory findings or other objective evidence. E.g., Blankenship v. Bowen, 874 F.2d 1116, 1121 (6th Cir, 1989)(quoting Poulin v. Bowen, 817 F.2d 865, 873-74 (D.C. Cir. 1987)). Accordingly, the undersigned is not persuaded that Dr. Indukuri's treatment notes substantially support the rejection of his form assessments of plaintiff's *symptoms*.

Nonetheless, it is true that both treating psychiatrists initially regarded plaintiff's functional loss as mild, as reflected in their GAF assessment of 65 (Tr. 139, 176). Moreover, Dr. Indukuri consistently treated plaintiff by adjusting his medications, without taking any measures which

17

would indicate any severe decline in plaintiff's condition from the time of his initial evaluation, or even from the time of his treatment by Dr. Watts (see Tr. 20). Also, Dr. Indukuri's assessments are contradicted by the report of Dr. Doineau, which indicates a moderate level of medical and functional impairment, as well as by plaintiff's level of daily activity. Specifically, plaintiff reported being able to sit and whittle for hours at a time, to drive into town several times per week to pursue his buying and selling hobbies and business interests, and to work on his farm and care for the livestock (Tr. 22, 48, 49, 60, 159). Thus, substantial evidence supports the rejection of Dr. Indukuri's opinion, as well as the ALJ's finding that plaintiff is only moderately limited in, and thus still capable of, performing simple job tasks on a sustained basis.

Plaintiff aptly notes that his hearing testimony was rambling and sometimes unresponsive; that the woodworking job identified by the VE appears incompatible with the limitation against working with hazardous machinery;[8] that his ability to go on a vacation does not necessarily indicate an ability to perform sustained work activity; and, that episodes of decompensation do

_____

[8]The woodworking job accounted for only a small portion of the number of available jobs which the VE was able to identify (Tr. 63-64). Also, plaintiff's notation "that the vocational expert does not say whether any of these jobs are in or within reasonable driving distance of the claimant's home in Marshall County, an economically depressed area at this time" (Docket Entry No. 14 at 4), is unavailing, as the jobs identified are not isolated but clearly exist in plaintiff's regional economy, and there is no requirement that they exist in reasonable proximity to plaintiff's residence. Harmon v. Apfel, 168 F.3d 289, 292-93 (6th Cir. 1999); 20 C.F.R. § 404.1566(a), (b).

Case 1:06-cv-00003   Document 25   Filed 05/04/07   Page 18 of 28 PageID #: 193

not require hospitalization in order to be substantiated. (Docket Entry No. 14 at 3-4) However, these points do not require the reversal of the otherwise substantially supported ALJ decision, which is to be affirmed even if opposed by a preponderance of the evidence. See Bell v. Comm'r of Soc. Sec., 105 F.3d 244, 245 (6th Cir. 1996). In the absence of legal error, the level of deference inherent in this standard of review must prevail over such criticisms as plaintiff levels at the ALJ's reasoning, and over his allegation of bias evidenced by the ALJ's finding of "suboptimal motivation to return to work." (Tr. 22) The latter observation was made in reference to plaintiff's receipt of two years of private disability benefits upon ending his employment, as well as his wife's gainful employment in the computer field (id.), and cannot reasonably be said to reflect any bias on the part of the ALJ.

Finally, to the extent that plaintiff quarrels with the vocational expert testimony that the jobs she identified are compatible with moderate mental limitations, it is clear that the ALJ was entitled to rely on the expert to clarify such matters. E.g., Wright v. Massanari, 321 F.3d 611, 616 (6th Cir. 2003). In sum, the undersigned finds no reversible error in the ALJ's analysis, and concludes that substantial evidence on the record as a whole supports the decision reached.

19

## ii. Remand is not justified

It is well established that the party seeking remand bears the burden of showing that remand is proper under § 405(g). Sizemore v. Sec'y of Health & Human Svcs., 865 F.2d 709, 711 (6th Cir. 1988). The sixth sentence of § 405(g) states that the Court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding[.]" As noted by the Sixth Circuit in Foster v. Halter, 279 F.3d 348 (6th Cir. 2001), for purposes of a sentence six remand,

> [E]vidence is new only if it was "not in existence or available to the claimant at the time of the administrative proceeding." Such evidence is "material" only if there is "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." A claimant shows "good cause" by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ.

Id. at 357 (internal citations omitted).

Plaintiff argues that remand is justified for the following reasons:

> Additional information has come to light regarding the disability of the claimant. A laboratory test has concluded that the [claimant] has Lyme Disease, a disease whose symptoms include swollen joints, sleep disorders, cognitive changes (memory problems, confusion, decreased concentration); and behavioral changes (depression, personality changes). The

20

> [claimant] has had problems with swollen joints (page
> 136) and sleep disorders (page 125) as well as memory
> problems, confusion, decreased concentration, and
> depression and personality changes discussed above.
> See Exhibit A for the Lab Test.  Lyme tests were not
> performed until 2005, after the hearing with the ALJ.
> The results of the IgeneX test is dated January 26,
> 2006.

(Docket Entry No. 14 at 4)

It is clear that the laboratory test results plaintiff proffers are new, as they were not in existence at the time of his administrative hearing.  It further appears that good cause exists for his failure to procure such evidence prior to the hearing, since plaintiff cannot be faulted for failing to pursue earlier a physical reason for symptoms that had long been treated under established psychological diagnoses.  However, there has been no showing that these bare test results are material to the disposition of the claim that was before the ALJ.

It would appear on the surface that evidence which tends to support the existence of a specific impairment that was not considered by the ALJ must be material to the disability decision.  However, the exhibit itself disclaims its sufficiency to definitively establish the presence of Lyme disease, which remains a clinical diagnosis.  The exhibit also fails to establish any indication of Lyme disease prior to December 15, 2004, the date of the ALJ's decision.  Plaintiff concludes from the literature attached to his brief as Exhibit B that he not only suffered from Lyme disease during the period relevant to

this appeal, but in fact stage 2 Lyme disease. However, that same literature states that stage 2 Lyme disease is treatable over the course of weeks or months (Docket Entry No. 14-3 at 8). In any event, plaintiff does not ascribe to Lyme disease any symptoms or limitations which the ALJ previously rejected as unsupported; rather, the new evidence merely points to a possible bacterial source of what were previously deemed entirely psychological symptoms. Because the ALJ recognized moderate mental limitations owing to what was diagnosed as bipolar disorder with depressed mood, plaintiff's showing that those symptoms may have been due in part to Lyme disease, without any additional clinical evidence bearing on the severity of his symptoms, is insufficient to establish a reasonable probability that the ALJ would have reached a different disposition of his claim if presented with the test results advanced here.

Accordingly, the undersigned concludes that plaintiff's alternative request for a sentence six remand should be denied.

## B. Review of Hartford's Decision as the ERISA Plan Administrator

As an initial matter, during her prior association with this case, Magistrate Judge Griffin recognized that "[a]lthough the plaintiff refers to ERISA cases [in his motion for judgment], he clearly concentrates on his Social Security claim and the findings of the Administrative Law Judge." (Docket Entry No. 15

22

at 1)  Further evidence that plaintiff has essentially abandoned his ERISA claim is found in his failure to respond to Hartford's motions in this case.  Pursuant to Local Rule 7.01(b), this failure to respond indicates that plaintiff does not oppose the motion for judgment on the administrative record, and the undersigned recommends ruling in Hartford's favor on that basis.

Alternatively, upon review of the merits of Hartford's motion, it is plain to the undersigned that it is well taken.

In light of the provision to Hartford of "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy" (see Docket Entry No. 17, Administrative Record (AR) 17), this Court reviews Hartford's determinations under the arbitrary and capricious standard.  E.g., Administrative Comm. v. Robinson, 164 F.3d 981, 986-87 (6th Cir. 1999).  Under this standard of review, Hartford's decision to terminate plaintiff's benefits after two years will pass muster if that decision can be given a reasoned explanation based on the evidence.  Bagsby v. Central States, Southeast & Southwest, 162 F.3d 424, 428 (6th Cir. 1998)(quoting Davis v. Kentucky Fin. Cos. Retirement Plan, 887 F.2d 689, 693 (6th Cir. 1989)).  Hartford's refusal thereafter to reopen the claim which entitled plaintiff to this closed period of benefits, upon plaintiff's oral request for same in light of his alleged Lyme disease, will pass muster

23

if it was rational in light of the policy provisions.  <u>Miller v.</u>
<u>Metropolitan Life Ins. Co.</u>, 925 F.2d 979, 986 (6th Cir. 1991).

As detailed in Hartford's memorandum (Docket Entry No.
22), its policy unambiguously provides that if a plan participant
is disabled because of "Mental Illness that results from any
cause," then benefits will be payable for a lifetime total of 24
months (AR 9).  "Mental Illness" is later defined by the policy
to mean "any psychological, behavioral or emotional disorder or
ailment of the mind, including physical manifestations of
psychological or emotional disorders, but excluding demonstrable,
structural brain damage."  (AR 19)  In accord with these
provisions and the finding of Hartford's agents that plaintiff
was in fact disabled by his bipolar disorder, Hartford advised
plaintiff by letter dated June 15, 2001, that he had been
approved for benefits, but that such benefits were subject to
duration limits under the policy based on the medical
documentation of record (AR 39-41).  Plaintiff received benefits
according to his entitlement under the policy from December 10,
2000, until December 10, 2002 (AR 37).  It was not until October
2005 that plaintiff contacted Hartford by telephone, seeking to
determine whether his claim could be reopened based on his recent
diagnosis with Lyme disease (AR 45).  Plaintiff was advised in
October and December of 2005 to submit his request for reopening
in writing, as an appeal of the termination of his benefits after

24

24 months, but no such written appeal was received by Hartford (AR 44-45).  On January 12, 2006, plaintiff filed the instant suit.

Far from being arbitrary and capricious, Hartford's invocation of the 24-month limitation on policy proceeds due to plaintiff's mental illness is supported by just about every shred of the medical evidence, which is dominated by the records of plaintiff's treating psychiatrist (AR 65-92, 109-123).  Even the records from plaintiff's treating physician (AR 128-132) are largely concerned with plaintiff's mental health.  Moreover, Hartford would appear to have been justified in construing plaintiff's disabling condition as a mental illness under the policy, even if the cause of plaintiff's symptoms had been timely proven to have resulted from Lyme disease, as alleged in his complaint.  The vast majority of symptoms of which plaintiff complains (Docket Entry No. 1 at 2-3) are limitations of mental function, and the policy provision which limits benefits to 24 months is triggered by disability due to "Mental Illness that results from any cause" (AR 9), be it psychological, traumatic, or, as plaintiff alleges, bacterial.

Of course, plaintiff's symptoms were not timely shown to be caused by Lyme disease, nor did plaintiff follow up on the advice of Hartford's representatives to submit his untimely appeal in writing, consistent with the policy requirement of

25

written notice of a claim (AR 15). Hartford plainly acted rationally in light of the policy's provisions when it required written notice of plaintiff's request to reopen. By his own admission, plaintiff has not been diagnosed or treated by any physician for Lyme disease, but is himself pursuing "cures" which he found on the internet (Docket Entry No. 1 at 4-5). However, plaintiff's failure to at least deliver written notice of his request for reopening precluded any possibility of progress on the administrative front, and Hartford was fully justified in continuing to treat plaintiff's disability claim as a closed case. See Miller v. Metropolitan Life Ins. Co., 925 F.2d at 986-87.[9]

Finally, based on the discussion above and the law governing ERISA cases, the undersigned would agree with Hartford that plaintiff has failed to exhaust his administrative remedies

---

[9]The Miller court concluded that

> [T]he district court correctly considered plaintiff's failure to supply the documentation requested by Metropolitan subsequent to the initial termination of benefits. It was not arbitrary and capricious for Metropolitan to continue to deny benefits even though plaintiff maintained that she was still disabled and requested a second independent examination because plaintiff refused to comply with the procedures set forth in the Plan and failed to provide continuing medical documentation of her disability. It is not difficult to understand why plaintiff failed to provide the documentation requested because she no longer was under the care of a psychiatrist. This failure on the part of plaintiff thwarted the administrative appeals process and justified Metropolitan's final denial of disability benefits after plaintiff's request for reconsideration."

with respect to his physical disability claim, <u>Miller</u>, 925 F.2d at 986, and that his prayer for punitive damages must fail. <u>Caffey v. Unum Life Ins. Co.</u>, 302 F.3d 576, 583 (6th Cir. 2002).

### III. RECOMMENDATION

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be DENIED; that the decision of the Commissioner of Social Security be AFFIRMED; that Hartford's motion for judgment on the administrative record be GRANTED; and, that plaintiff's case be DISMISSED with prejudice.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Cowherd v. Million</u>, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

27

**ENTERED** this 4th day of May, 2007.

  s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE